**Donna PARIS, Plaintiff,**

v.

**The ARC/DAVIDSON COUNTY, INC. and The Arc of Davidson County, Defendants.**

**No. 1:02CV01012.**

United States District Court, M.D. North Carolina.

Feb. 25, 2004.

745

Tamara W. Brooks, Widis & Brooks, PLLC, Charlotte, NC, for plaintiff.

David William Sar, Brooks Pierce McLendon Humphrey & Leonard, Greensboro, NC, Ruth W. Woodling, Jennifer Bussey Sandberg, Fisher & Phillips, Atlanta, GA, for defendants.

*MEMORANDUM OPINION*

BULLOCK, District Judge.

On November 22, 2002, Donna Paris ("Plaintiff") filed this employment discrimination action against The ARC/Davidson County, Inc., and The ARC of Davidson County (collectively "ARC"). Plaintiff's complaint appears to allege four bases for relief in two separate counts: (1) hostile work environment and discriminatory discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); and (2) failure to accommodate a disability and discriminatory discharge in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et*

*seq.* ("ADA"). Before the court is ARC's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The court has reviewed Plaintiff's complaint, the parties' briefs, and the other materials in the record. For the following reasons, ARC's motion for summary judgment will be granted.[1]

## FACTS

Formerly known as the Association for Retarded Citizens, ARC is a non-profit organization affiliated with the ARC of North Carolina, as well as the National ARC. ARC is governed locally by a volunteer Board of Directors ("the Board"), which has final authority with regard to all ARC policy initiatives, personnel matters, and budgetary decisions. ARC provides a variety of services and outreach programs for developmentally disabled adults through funding provided by Medicare and Medicaid, the North Carolina Division of Mental Health, the Davidson County Special Assistance Programs, and the United Way. As part of its residential services program, ARC operates four licensed supervised living facilities to provide its developmentally disabled clients with assistance and training in all areas of independent living. ARC also provides some of its developmentally disabled

clients with transportation in order to accommodate their medical and personal needs.

ARC is dependent upon the Davidson County Area Mental Health Association ("Davidson County") for a portion of its funding. Pursuant to the terms of its contract with Davidson County, ARC is required to employ a Qualified Developmental Disabilities Professional ("QDDP") within its residential services program. The QDDP is primarily responsible for managing client-specific "service plans" or "individualized treatment plans," which set independent living goals for ARC's developmentally disabled clients. Prior to 1996, the Board had hired an independent contractor to perform QDDP services for ARC; however, the Board hired Plaintiff during the fall of 1996 to serve as ARC's full-time habilitation coordinator for residential services ("habilitation coordinator").[2]

Plaintiff is a thirty-six-year-old white female who has worked with developmentally disabled adults since her graduation from college in 1989. Following a work-related automobile accident in 1991, physicians diagnosed Plaintiff with spondylolisthesis,[3] "a condition that affects her back and causes constant lower back and leg

---

1. Plaintiff's complaint also states supplemental claims of intentional infliction of emotional distress and negligent supervision of an employee in violation of North Carolina state law. However, Plaintiff unequivocally abandoned both claims in her brief in opposition to Defendants' motion for summary judgment. (*See* Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J. at 18.) Therefore, the court will grant ARC's motion for summary judgment as to Plaintiff's claims of intentional infliction of emotional distress and negligent supervision.

2. According to a written job description of Plaintiff's position, "[t]he habilitation coordinator [for residential services] is the qualified disability professional that works with the

clients in the ARC of Davidson County Residential Program." (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Tab I; Pl.'s Dep. at 78–79.)

3. Spondylolisthesis is the "forward displacement of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth, usually due to a developmental defect in the pars interarticularis." *Dorland's Illustrated Medical Dictionary* 1239 (26th ed. 1985). Plaintiff describes spondylolisthesis as "a condition where the spinal column and pelvic [sic] are sliding forward, basically." (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Tab I; Pl.'s Dep. at 26.)

pain." (Pl.'s Compl. ¶ 29.) Plaintiff contends that spondylolisthesis qualifies as a disability and that "one accommodation required by [Plaintiff] and her disability is a sedentary job." (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J. at 2.)

When Plaintiff applied for employment with ARC, she met with LaRue Kennedy, ARC's residential program director, for an initial interview. During their interview, Kennedy provided Plaintiff with a description of the habilitation coordinator position and questioned Plaintiff about her background and experience. Plaintiff contends that she candidly discussed her back condition with Kennedy and specifically asked Kennedy "whether or not . . . direct physical contact with clients, would be involved." (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Tab I; Pl.'s Dep. at 45.) According to Plaintiff, Kennedy responded that "this particular job . . . would not be hands-on." (Id.)

Following her initial interview with Kennedy, Plaintiff participated in two follow-up interviews with the Board and the Board's personnel committee. During both follow-up interviews, Plaintiff answered the Board's questions about her education and job experience; however, Plaintiff never mentioned during either interview that physicians had diagnosed her with spondylolisthesis in 1991 or that she considered herself disabled. Instead, Plaintiff provided ARC with a signed medical statement from her physician, dated September 12, 1996, that certified "[Plaintiff] is able to carry out duties that may be required in working with persons with developmental disabilities including bending, kneeling or lifting." (Defs.' Mem. Supp. Mot. Summ. J., Ex. D.)

When Plaintiff began her employment with ARC in September 1996, she worked under the direct supervision of Kennedy. Plaintiff's position as habilitation coordinator generally involved administrative development and implementation of support services for clients living in ARC's supervised living facilities. (Defs.' Reply Mem. Supp. Mot. Summ. J., Ex. D.) Specifically, Plaintiff's duties as habilitation coordinator included monitoring clients' medical needs, developing new treatment plans for clients, assisting clients with their grievances and concerns, providing clients with transportation as needed, and data management. (Id.)

In 1998, the Board hired Vera McRae, an African–American female, as ARC's full-time executive director. Also in 1998, the Board named Plaintiff as ARC's assistant residential program director. As ARC's assistant residential program director, Plaintiff continued to provide QDDP services for ARC under the direct supervision of Kennedy and assisted Kennedy with the management of operations at ARC's supervised living facilities. (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Tab I; Pl.'s Dep. at 64). Specifically, Plaintiff's responsibilities as assistant residential program director included managing client treatment plans, delivering services to ARC clients, counseling and crisis intervention, monitoring clients' medication and medical appointments, and developing policies and procedures to comply with various state and local rules and regulations. (Id. at 65.)

According to Plaintiff, she experienced no difficulty performing her job at ARC from September 1996 until October 2001 because she worked "in an administrative capacity making leadership decisions and delegating duties." (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Ex. D.) Plaintiff contends that during her first five years at ARC, "[she] received excellent reviews, salary increases, and bonuses as a reflection." (Id.) During her first five years at ARC, Plaintiff also provided ARC with two more signed medical statements

from her physicians, dated October 26, 1999, and February 12, 2001, that certified "[Plaintiff] is able to carry out duties that may be required in working with persons with developmental disabilities including bending, kneeling or lifting." (Defs.' Mem. Supp. Mot. Summ. J., Ex. D.)

In July and August 2001, the Board met to discuss ARC's financial situation after several members of the Board and ARC's accountant expressed concerns regarding ARC's financial situation. During both meetings, the Board agreed to make budget cuts in order to stabilize ARC's financial situation. For example, the Board declined to fill two vacant managerial positions within ARC's supervised living facilities and relied on other ARC employees to perform extra work created by the vacancies.

In either late September or early October 2001, the Board reorganized ARC's internal structure so that ARC's administrative unit could share funds with ARC's residential services program. As a result, the Board gave McRae supervisory responsibility over ARC's residential services staff, in addition to her administrative duties as ARC's executive director, and eliminated Plaintiff's position as ARC's assistant residential program director. Thereafter, Plaintiff continued her duties as habilitation coordinator under the direct supervision of Kennedy and McRae. According to Plaintiff's complaint, McRae stated on several occasions that ARC "did not employ enough black people." (Pl.'s Compl. ¶ 10.)

Plaintiff contends that her position as ARC's habilitation coordinator became more physically demanding and active during October 2001 because of several unexpected changes in her job duties, which included reporting to one of five job locations, driving different vehicles, assisting clients into and out of vans and in and out of their medical appointments, dressing and undressing clients, bathing and wiping clients, cooking lunch for clients and cleaning up the kitchen, and doing laundry when clients had personal care accidents. (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Ex. D.) Plaintiff also contends that the physical strain of her new job duties adversely affected her back condition because "[she] seldom had opportunities to sit at [her] leisure" and because her job involved "constant repetitive type movements" such as driving, lifting, pushing, pulling, and bending. (*Id.*) According to Plaintiff, she affirmatively requested an accommodation from ARC within a few weeks of performing her new job duties and spoke to Kennedy "almost on a daily basis about it." (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Tab I; Pl.'s Dep. at 193.)

On November 2, 2001, Plaintiff met with Kennedy to discuss Plaintiff's job duties and new responsibilities as ARC's habilitation coordinator. According to Kennedy's typewritten notes, Plaintiff expressed dissatisfaction about her job at ARC.

> [Plaintiff] states she feels that her work responsibilities have tripled, that she does not understand why and that she feels she has done something wrong. States that no one listens to her and that what she says does not make a difference.
>
> She commented on a physical disability that we (Arc) are not aware of and are not concerned with, she would not discuss further when asked to explain. She remarked that we (Arc Administrative staff) no [sic] nothing about what we are asking her to do, [and] that we should go into the homes and observe staff.

(Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Ex. E; Defs.' Mem. Supp. Mot. Summ. J., Ex. H.) Following her conversation with Plaintiff, Kennedy concluded that

Plaintiff was qualified to perform her responsibilities as habilitation coordinator; however, Kennedy observed that "[Plaintiff] is not happy, and does not want to be here (Arc), [and] this may interfere with her job performance." (*Id.*)

On November 8, 2001, Plaintiff injured her back while providing hands-on, direct care to a client in the bathroom. According to Plaintiff, she leaned over the client and immediately felt "[e]xcruciating pain . . . in the direct center of [her] lower back and [the pain] spread down both [of her] legs so severely that [she] crouched to the floor and began to cry." (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Ex. H.) Plaintiff contends that she reported her back injury to Kennedy and told Kennedy that "[she] could not physically continue at this rate on a daily basis." (*Id.*) Later that day, Plaintiff sought treatment from her physician for her back injury.[4]

On November 20, 2001, Plaintiff spoke once again with Kennedy about her responsibilities as ARC's habilitation coordinator. According to Kennedy's typewritten notes, Plaintiff expressed frustration with her job and other employees at ARC.

> [Plaintiff] again [began] to complain that she had been very busy, no time for anything other than medical appointments and that she was not sure how much longer she was going to 'put up with this job'. Stated she was almost at the point of telling 'us' what we could do with our job. . . . She appears overwhelmed with job responsibilities or that she is not going to accept changes. I am unsure what problems she is having, when asked to explain what her concerns are she stated no one listens to me and [began] crying.
>
> [McRae] was asked to listen to what [Plaintiff] was saying, [and Plaintiff began] to tell [McRae] that she has [too] much to do, no one understands her, and no one knows what she does, she states that her co-workers will not cooperate with her (help her). She stated that this job is affecting her mentally and physically, that she cannot think clearly, and then [began] to cry (uncontrolled) for a long period of time.

(Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Ex. F.) Kennedy's notes reflect that McRae and Kennedy granted Plaintiff a leave of absence and instructed her to return to work on November 26. (*Id.*)

On November 28, 2001, Plaintiff visited her physician, Dr. Lloyd E. Nickerson, because her back pain would not go away. During their meeting, Dr. Nickerson advised Plaintiff to speak with her direct supervisor regarding an accommodation for her alleged disability. (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Tab I; Pl.'s Dep. at 154.) According to Plaintiff, "[Dr. Nickerson] felt like since I had worked [at ARC] the length of time that I had worked there, that there should be some accommodations." (*Id.* at 156.)

On November 29, 2001, Plaintiff met with Kennedy a third time to discuss her job duties and responsibilities as ARC's habilitation coordinator. The parties have presented completely different versions of Plaintiff's conversation with Kennedy. According to ARC, Plaintiff never specifically requested an accommodation during her meeting with Kennedy. ARC contends

---

**4.** According to Plaintiff's deposition, Plaintiff sought treatment from physicians on three different occasions for her back injury and related back pain between November 8, 2001, and November 28, 2001. (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Tab I; Pl.'s Dep. at 151–52.) "[Her] lower back injury result[ed] in sciatica and lumbar disc herniation with need for surgical repair and restoration by Dr. Ranjan Roy." (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Ex. Q.)

that Kennedy's typewritten notes show Plaintiff told Kennedy that "she does not need help[,] that she is a specialist, and [a] perfectionist, that she is very task oriented and likes a challenge, [and that] the 'others' (staff) were the one with a problem and this is not going to work." (Defs.' Mem. Supp. Mot. Summ. J., Ex. H.)

Plaintiff presents two conflicting versions of her conversation with Kennedy. During her deposition, Plaintiff testified that she did speak to Kennedy about how the changes in her job duties had affected her physically and emotionally, but never requested any specific type of accommodation from Kennedy. (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Tab I; Pl.'s Dep. at 230.) However, in an affidavit dated October 29, 2003, and submitted in opposition to ARC's motion for summary judgment, Plaintiff contends that she "repeatedly asked for the accommodation of less physical activity in [her] job like it was prior to the changes in October 2001." (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Ex. A.).

On November 29, 2001, Plaintiff also called Dr. Nickerson and told him that "no accommodations would be made." (Pl.'s Dep. at 156.) After speaking with Plaintiff, Dr. Nickerson provided Plaintiff with a doctor's note, which recommended that Plaintiff not work until she met with her neurosurgeon, Dr. Ranjan Roy, on December 17, 2001. After speaking with Dr. Nickerson, Plaintiff left Kennedy two messages on her home answering machine informing Kennedy of Dr. Nickerson's recommendation that Plaintiff stay out of work until she met with Dr. Roy.

On the morning of November 30, 2001, the Board's executive committee met to discuss the recent organizational changes within ARC and to review ARC's financial situation. During its meeting, the Board voted unanimously to eliminate Plaintiff's position as ARC's habilitation coordinator because the Board believed that it could hire an independent contractor to perform QDDP services for ARC at a fraction of Plaintiff's salary. Both Kennedy and McRae were present during the Board's meeting; however, neither Kennedy nor McRae participated in the Board's decision to eliminate Plaintiff's position as ARC's habilitation coordinator. (See Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Tab IV; McRae Dep. at 46–49; see also Defs.' Mem. Supp. Mot. Summ. J., Exs. A, C.)

After the Board announced its decision to eliminate Plaintiff's position as ARC's habilitation coordinator, the Board asked McRae to call Plaintiff into the room so that the Board could inform Plaintiff of its decision. When Kennedy informed the Board of Plaintiff's absence from work for medical reasons, a member of the Board dictated a letter to Plaintiff which informed Plaintiff that "[d]ue to the restructuring of our organization and cost constraints, your services are no longer needed with the Arc of Davidson County as of November 30, 2001." (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Ex. M.) The Board instructed McRae to sign the letter in her official capacity as ARC's executive director.

Kennedy also informed the Board on November 30, 2001, that ARC's contract with Davidson County required ARC to employ a QDDP within its residential services program at all times. The Board realized that its decision to eliminate Plaintiff's position put ARC's funding at risk and immediately authorized Kennedy to find an independent contractor to perform QDDP services for ARC. Kennedy contacted a local mental health professional who recommended that Kennedy contact Kathryn Smith, a white female. Smith agreed to work for ARC on a short-term basis, but she refused to make any long-

term contractual commitment to ARC. Kennedy subsequently approached Judy Dalton, an African–American female, because Kennedy knew that Dalton had performed QDDP services for other local mental health agencies in the past. Dalton eventually agreed to perform QDDP services for ARC on a contractual basis.

On May 24, 2002, Plaintiff filed a charge of employment discrimination against ARC with the Equal Employment Opportunity Commission ("EEOC"). On August 27, 2002, the EEOC dismissed Plaintiff's charges against ARC and issued Plaintiff a right-to-sue letter. On November 22, 2002, Plaintiff filed this action against Defendant appearing to allege hostile work environment and discriminatory discharge in violation of Title VII, and failure to accommodate a disability and wrongful discharge in violation of the ADA.

## DISCUSSION

Summary judgment must be granted when the pleadings, responses to discovery, and the record show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party bears the burden of persuasion on all relevant issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *see also Cray Communications, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 393–94 (4th Cir.1994) (moving party on summary judgment may simply argue the absence of evidence by which the non-moving party can prove her case). The non-moving party may survive a motion for summary judgment by producing "evidence from which a [fact finder] might return a verdict in his [or her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment is proper only when there are no genuine issues presented for trial and the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In considering the evidence, all reasonable inferences must be drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient; there must be evidence on which the [fact finder] could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505.

### A. Plaintiff's Title VII Claims

#### 1. Hostile Work Environment

In her first claim for relief, Plaintiff contends that she was subjected to a hostile work environment while working at ARC on the basis of McRae's alleged statements that ARC did not employ enough black people. (Pl.'s Compl. ¶¶ 10–14; Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J. at 18.) Under Title VII, it is "an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e–2(a)(1). Title VII creates a cause of action in favor of persons forced to work in a hostile workplace because the workplace environment is considered a term, condition, or privilege of employment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

■ "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment Title VII is violated." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotations and citations omitted). In the instant case, Plaintiff must establish four elements to support her hostile work environment claim: (1) she was subjected to unwelcome harassment; (2) the harassment was based on race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and created an abusive working environment; and (4) some basis exists for imposing liability on the employer. *See Causey v. Balog,* 162 F.3d 795, 801 (4th Cir.1998); *see also White v. Fed. Express Corp.,* 939 F.2d 157, 159–60 (4th Cir.1991). Viewing the facts in a light most favorable to Plaintiff, the court will assume without deciding that Plaintiff has satisfied the first two elements required to support her hostile work environment claim. Therefore, Plaintiff must demonstrate that the harassment was sufficiently severe or pervasive to create an abusive working environment, and that some basis exists to impose liability on ARC, in order to survive summary judgment.

"[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Vinson,* 477 U.S. at 67, 106 S.Ct. 2399 (citation omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris,* 510 U.S. at 21, 114 S.Ct. 367. In deciding whether the challenged conduct is sufficiently severe or pervasive to trigger the protections of Title VII, a court must "ex-amine the totality of the circumstances, including '[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Hopkins v. Baltimore Gas and Elec. Co.,* 77 F.3d 745, 753 (4th Cir.) (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367), *cert. denied,* 519 U.S. 818, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996).

■ In the instant case, Plaintiff contends that McRae's alleged statements that ARC did not employ enough black people were sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive working environment. (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J. at 18.) Viewing the evidence in a light most favorable to Plaintiff and taking Plaintiff's allegations as true, Plaintiff has failed to present sufficient evidence to support the third element of her hostile work environment claim. "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." *Hopkins,* 77 F.3d at 754. The mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee does not affect the conditions of employment to a sufficiently significant degree so as to violate Title VII. *See Vinson,* 477 U.S. at 67, 106 S.Ct. 2399 (citation omitted); *see also Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (" '[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " (internal citation omitted)). Therefore, the court will grant ARC's motion for summary judgment as to Plaintiff's hostile work environment claim under Title VII.

## 2. Discriminatory Discharge

In her first claim for relief, Plaintiff also contends that ARC "discriminated against Plaintiff on the basis of her race, White, by actions including, but not limited to, offensive and abusive language, offensive behavior, and refusing to address the hostile work environment, although it had the obligation, opportunity, and means to do so." (Pl.'s Compl. ¶ 15). Although the exact nature of Plaintiffs' claim is unclear, both parties have interpreted the allegations contained in Plaintiff's complaint as stating a claim of discriminatory discharge on the basis of race in violation of Title VII.

■ "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). An individual alleging disparate treatment based upon race must produce sufficient evidence upon which a reasonable juror could find that race actually played a role in the employer's decisionmaking process and that race had a determinative influence on the outcome of the employer's decisionmaking process. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir.2004) (quoting *Reeves*, 530 U.S. at 141, 120 S.Ct. 2097). In order to prove race-based discriminatory discharge in violation of Title VII, a plaintiff may provide direct evidence of discrimination or proceed with circumstantial evidence of discrimination under the burden-shifting scheme of proof established by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ According to the Fourth Circuit, direct evidence of discrimination includes " 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.' " *Hill*, 354 F.3d at 284–85 (quoting *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir.1995)). Racially discriminatory or derogatory remarks may constitute direct evidence of discrimination; however, "[the remarks] cannot be stray or isolated and '[u]nless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of [discrimination].' " *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999) (quoting *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686 (7th Cir.1991)), *abrogated on other grounds by Baird ex rel. Baird v. Rose*, 192 F.3d 462, 470 n. 8 (4th Cir.1999). In the instant case, Plaintiff contends that McRae's alleged comments that ARC did not employ enough black people constitute direct evidence of discrimination that is sufficient to create a genuine issue of material fact as to whether ARC eliminated Plaintiff's position as habilitation coordinator on the basis of her race.

Although McRae's alleged statements may reflect a discriminatory attitude and preference for members of a particular racial group, Plaintiff has failed to show that McRae's alleged statements were more than just stray or isolated remarks. Plaintiff has also failed to show how McRae's alleged discriminatory statements about hiring African–American employees relate to the Board's decision to eliminate Plaintiff's position as habilitation coordinator. In fact, the evidence presented clearly shows that the Board possessed final decisionmaking authority as to all personnel matters affecting ARC and that McRae had no direct influence over the Board's decision to eliminate Plaintiff's position on November 31, 2001. *See Hill*, 354 F.3d at 291 (holding that a plaintiff "who rests a discrimination claim ... upon the discriminatory motivations of a subordinate em-

ployee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer").

Furthermore, Plaintiff has failed to establish that McRae ever directly influenced any of the Board's hiring and firing decisions. To the contrary, McRae testified in her deposition that her role in the hiring process at ARC was limited to the initial screening of applications for employment and that she never made any recommendations to the Board concerning who the Board should hire as an employee of ARC.

Q: How does someone get hired at the ARC?

A: Well, if there are positions available, they are advertised through the Employment Security Commission. At that time they are sent from the Employment Security Commission. They fill out an application. Applications are gathered, depending on the position. If it's in residential, LaRue Kennedy screens the application. If it's anything other than that, I am the one who screens the applications. They are then forwarded to the personnel committee and they make the decision on who is hired with some recommendations from that direct supervisor in that program.

Q: If you recommend someone to be hired to the board, do they always go with your recommendation?

A: No.

Q: How many times have they told you no?

A: I haven't had any recommendations.

(Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Tab. IV; McRae Dep. at 49.) Based on the evidence presented, no rational juror could conclude that any nexus exists between McRae's alleged discriminatory statements and the Board's decision to eliminate Plaintiff's position as habilitation coordinator. Therefore, the court finds that Plaintiff has failed to present direct evidence of discrimination that is sufficiently probative of ARC's discriminatory intent to create a genuine issue of material fact as to whether ARC eliminated Plaintiff's position as habilitation coordinator on the basis of her race.

When a plaintiff cannot produce direct evidence of an employer's discriminatory intent, the plaintiff may prove her case with circumstantial evidence under the burden-shifting scheme of proof established in *McDonnell Douglas*. As stated above, Plaintiff has failed to produce direct evidence of discriminatory intent on the part of ARC. Therefore, Plaintiff must rely on the *McDonnell Douglas* burden-shifting framework to establish her cause of action for racial discrimination and to survive summary judgment. *See Lucas v. Dole*, 835 F.2d 532, 533–34 (4th Cir.1987) (recognizing that the *McDonnell Douglas* framework applies to reverse discrimination claims brought under Title VII).

Under *McDonnell Douglas*, the initial burden falls on the plaintiff to demonstrate a *prima facie* case of racial discrimination. *See Causey*, 162 F.3d at 800. If the plaintiff satisfies this initial burden, then a presumption of discrimination arises, and the burden shifts to the employer to produce a legitimate, non-discriminatory reason for its adverse employment action. *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997). If the employer satisfies its burden of production, then "the presumption of discrimination that arose from the *prima facie* case disappears, and the burden of proof is left with the plaintiff to show that the employer acted with a discriminatory intent and that its proffered explanation was a pretext for discrimination." *McNeil v. Scotland County*, 213 F.Supp.2d 559, 566 (M.D.N.C.2002) (citing *Texas Dep't of*

*Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

■ In order to establish a *prima facie* case of discriminatory discharge, Plaintiff must establish four elements by a preponderance of the evidence: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) at the time of the adverse employment action, she was performing at a level that met her employer's legitimate job expectations; and (4) the position remained open to or was filled by similarly qualified applicants outside the protected class. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir.2003). Although the Supreme Court has held that Title VII protects members of the white majority as well as minorities, *see McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), some courts have held that a member of the white majority who alleges reverse discrimination must also show "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1017 (D.C.Cir.1981); *see Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 457 (7th Cir.1999); *Duffy v. Wolle*, 123 F.3d 1026, 1036–37 (8th Cir.1997), *cert. denied*, 523 U.S. 1137, 118 S.Ct. 1839, 140 L.Ed.2d 1090 (1998); *Reynolds v. School Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1534 (10th Cir.1995); *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 66–67 (6th Cir.1985); *but see Iadimarco v. Runyon*, 190 F.3d 151, 163 (3d Cir.1999) (rejecting background circumstances test).

The Fourth Circuit has expressly declined to decide whether a plaintiff in a Title VII reverse discrimination case must produce additional evidence, beyond the traditional requirements of *McDonnell Douglas* and its progeny, to establish a *prima facie* case of racial discrimination. *See Lucas*, 835 F.2d at 534; *see also Weeks v. Union Camp Corp.*, 215 F.3d 1323, 2000 WL 727771, at *6 n. 13 (4th Cir.2000).

■ It is unnecessary for the court to resolve this difficult issue under the facts of the instant case. Even if Plaintiff could establish a *prima facie* case of discriminatory discharge, ARC has produced a legitimate, non-discriminatory reason for the Board's decision to eliminate Plaintiff's position as habilitation coordinator, and Plaintiff has failed to rebut ARC's proffered reason with evidence of pretext. The evidence presented clearly shows that ARC had experienced financial difficulties as early as July 2001. The evidence presented also shows that the Board reorganized ARC's internal structure in late September or early October 2001 so that ARC's administrative unit could share funds with ARC's residential services program. According to Rose Brock and Bill Lineberry, two members of the Board's executive committee in November 2001, the Board decided to eliminate Plaintiff's position as habilitation coordinator on November 30, 2001, for financial reasons. (Defs.' Mem. Supp. Mot. Summ. J., Exs. A and C.) Specifically, Brock stated that she knew the Board had hired an independent contractor to perform QDDP services for ARC in the past, and she thought that the Board could find an independent contractor to perform QDDP work for ARC once again at a fraction of Plaintiff's salary.[5] (*Id.*, Ex. A.)

---

**5.** As of November 2001, Plaintiff's salary was $35,000 per year. (Defs.' Mem. Supp. Mot. Summ. J., Ex. F; Kennedy Dep. at 20.) According to Kennedy's affidavit, Dalton initially agreed to perform QDDP services for ARC at a contract price of $12,000 per year. (Defs.' Mem. Supp. Mot. Summ. J., Ex. B.) The con-

Viewing the evidence in a light most favorable to Plaintiff, the court finds that Plaintiff has completely failed to produce any evidence that ARC's legitimate, non-discriminatory reason for eliminating Plaintiff's position as ARC's habilitation coordinator is false or a mere pretext for discrimination. Absent such evidence, no rational factfinder could conclude that Defendants' action was based on Plaintiff's race. *See Reeves*, 530 U.S. at 148, 120 S.Ct. 2097; *Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir.2000). Therefore, the court will grant ARC's motion for summary judgment as to Plaintiff's claim of racial discrimination under Title VII.

## B. Plaintiff's ADA Claims

Plaintiff alleges that "[ARC] terminated Plaintiff because of her disability and request for reasonable accommodations." (Pl.'s Compl. ¶ 37.) Plaintiff also alleges that "[ARC's] failure to make reasonable accommodations to Plaintiff's disability constitutes discrimination against her with respect to the terms, conditions, and privileges of employment and constitutes a violation of the ADA." (Pl.'s Compl. ¶ 39.) Title I of the ADA prohibits discrimination by a covered entity, including a private employer, "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also Pollard v. High's of Baltimore*, 281 F.3d 462, 467 (4th Cir.), *cert. denied*, 537 U.S. 827, 123 S.Ct. 122, 154 L.Ed.2d 39 (2002). Under the ADA, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability

who is an applicant or employee, unless [the] covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A).

■■ Plaintiff must establish four elements by a preponderance of the evidence in order to make out a *prima facie* case for failure to accommodate a disability under the ADA: (1) she was an individual who had a disability within the meaning of the statute; (2) her employer had notice of her disability; (3) with reasonable accommodation she could perform the essential functions of her position; and (4) her employer refused to make such accommodations. *See Rhoads v. F.D.I.C.*, 257 F.3d 373, 392 (4th Cir.2001) (quoting *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir.1999)), *cert. denied*, 535 U.S. 933, 122 S.Ct. 1309, 152 L.Ed.2d 219 (2002). Without direct evidence of her employer's discriminatory intent, Plaintiff must prove four elements by a preponderance of the evidence in order to make out a *prima facie* case of wrongful discharge under the ADA: (1) she is within the ADA's protected class; (2) she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir.2001) (citing *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir.1995)). Under both claims, Plaintiff must initially prove that she qualifies as disabled under the ADA in order to fall within the ADA's protected class. *See Gallimore v. Newman Mach. Co., Inc.*, 301 F.Supp.2d 431, 441 (M.D.N.C.2004).

tract price for Dalton's services currently stands at $15,000 per year. (Defs.' Mem.

Supp. Mot. Summ. J., Ex. F; Kennedy Dep. at 20.)

ARC contends that Plaintiff has failed to demonstrate that she is disabled based on the definition of a disability under the ADA. "The ADA defines 'disability' as a physical or mental impairment that substantially limits one or more of the major life activities of an individual, a record of such an impairment, or being regarded as having such an impairment." *Haulbrook,* 252 F.3d at 702–03 (citing 42 U.S.C. § 12102(2)). Plaintiff does not contend that she has a record of physical or mental impairment or that ARC regarded her as having such an impairment. Therefore, in order to satisfy the first element of a *prima facie* case for both claims, Plaintiff must prove that she has a physical or mental impairment that substantially limits her in at least one major life activity. *See* 42 U.S.C. § 12102(2)(A).

"To qualify as disabled under [the ADA], a claimant must initially prove that he or she has a physical or mental impairment." *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 194, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (citing 42 U.S.C. § 12102(2)(A)). According to regulations issued by the EEOC, the term "physical or mental impairment" means "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine[.]" 29 C.F.R. § 1630.2(h)(1).[6] In the instant case, Plain-

tiff's back condition affects her spinal column, lower back, and legs, which are components of Plaintiff's neurological and musculoskeletal systems. Therefore, the court finds that Plaintiff's back condition is a physiological disorder or condition that qualifies as a physical impairment under the ADA.

"Merely having an impairment does not make one disabled for purposes of the ADA." *Williams,* 534 U.S. at 195, 122 S.Ct. 681. A plaintiff must also demonstrate that she is substantially limited by a physical or mental impairment in at least one major life activity in order to qualify as disabled for purposes of the ADA. *See* 42 U.S.C. § 12102(2)(A). The term " 'major life activities' . . . refers to those activities that are of central importance to daily life." *Williams,* 534 U.S. at 197, 122 S.Ct. 681. According to the EEOC regulations, " '[m]ajor [l]ife [a]ctivities [include] functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' " *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 480, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (quoting 29 C.F.R. § 1630.2(i)). "[O]ther major life activities include . . . sitting, standing, lifting, [and] reaching." 29 C.F.R. pt. 1630, App. § 1630(i). The term "substantially limited" means " '[u]nable to perform a major life activity that the average person in the general population can perform'; or '[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life

---

**6.** The court recognizes that the persuasive authority of the Equal Employment Opportunity Commission (EEOC) regulations is unclear. *See Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 194, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002); *see also Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 480, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), *and Pollard v. High's of Baltimore, Inc.,* 281 F.3d 462, 468 n. 2 (4th Cir.), *cert. denied,* 537 U.S. 827,

123 S.Ct. 122, 154 L.Ed.2d 39 (2002). However, neither party has questioned the reasonableness of the EEOC guidelines or contested their application to the facts of the instant case. Therefore, the court finds it unnecessary to determine the validity of the EEOC guidelines or what level of deference they are due. *See Williams,* 534 U.S. at 194, 122 S.Ct. 681; *see also Pollard,* 281 F.3d at 468 n. 2.

activity as compared to ... the average person in the general population.'" *Sutton,* 527 U.S. at 480, 119 S.Ct. 2139 (quoting 29 C.F.R. § 1630.2(j)).

Courts must evaluate whether a person has a disability under the ADA on a case-by-case basis. *Id.* at 483, 119 S.Ct. 2139 (1999) (citing *Bragdon v. Abbott,* 524 U.S. 624, 641–42, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) and 29 C.F.R. pt. 1630, App. § 1630.2(j)). "[T]he ADA requires those claiming the Act's protection to prove a disability by offering evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial." *Williams,* 534 U.S. at 198, 122 S.Ct. 681 (quoting *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999)) (internal quotation marks and alterations omitted). In assessing whether an employee is disabled within the meaning of the ADA, the relevant time period is while the employee is still employed. *See Cortes v. McDonald's Corp.,* 955 F.Supp. 541, 547 (E.D.N.C.1996).

 In the instant case, Plaintiff contends that "[her back condition] requires that she not lift heavy objects or do any repetitive motion including bending and pulling." (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J. at 8.) In support of her contention, Plaintiff argues that her estranged husband, Matthew Paris, "supported her limitations in life activities by stating [during his deposition] that [Plaintiff] did not water-ski, hike or go four wheeling due to her condition." (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J. at 8.) However, Plaintiff has failed to show how her inability to water-ski, hike, or go four wheeling relate to her inability to lift heavy objects or engage in repetitive motion. Moreover, Plaintiff has failed to demonstrate that these are activities that the average person in the general population can perform.

Plaintiff also argues that Matthew Paris's deposition shows that her back condition "always caused some restrictions on 'her daily activities' including the fact that [Matthew Paris] had to do 'vacuuming, mopping, lifting heavier objects and yard work.'" (*Id.* at 9.) Viewing the evidence in a light most favorable to Plaintiff, Matthew Paris's deposition testimony establishes that Plaintiff did not vacuum or perform physical yard work, such as digging holes and planting trees. (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J., Tab. III; M. Paris Dep. at 24, 101.) The court recognizes that vacuuming and physical yard work are activities that may require heavy lifting as well as repetitive bending and pulling. However, Plaintiff's inability to vacuum or perform physical yard work does not indicate a significant restriction on Plaintiff's ability to perform a wide variety of household chores or other activities which involve heavy lifting or repetitive motion. To the contrary, Michael Paris's deposition shows that Plaintiff could mop, cook, and perform yard work, such as pulling weeds, and that Plaintiff always kept her house "spotless." (*Id.*)

Plaintiff has also submitted letters from three physicians who have commented on Plaintiff's ability to lift, push, pull, bend frequently, and perform other repetitive activities. However, the Fourth Circuit has repeatedly held that basic lifting restrictions and other associated limitations do not constitute evidence of a permanent impairment that substantially limits any major life activity under the ADA. In a case involving a worker with almost identical limitations, *Williams v. Channel Master Satellite Sys., Inc.,* the court of appeals held as a matter of law that a plaintiff with restrictions that she not lift more than twenty-five pounds or push or pull heavy objects was not disabled under the ADA because "a twenty-five pound lifting limitation ... does not constitute a significant

restriction on one's ability to lift, work, or perform any other major life activity." 101 F.3d 346, 349 (4th Cir.1996) (per curiam) (citation omitted), *cert. denied sub nom. Williams v. Avnet, Inc.,* 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997). *See also Pollard,* 281 F.3d at 470–71 (concluding that a plaintiff with restrictions that she not lift more than twenty-five pounds or bend repetitively did not suffer from a permanent impairment that substantially limited her in any major life activity); *Stewart v. Weast,* 228 F.Supp.2d 660, 662–63 (D.Md.2002) (stating that "a person is not substantially limited in a major life activity because she is limited to lifting ten to fifteen pounds" (citations omitted)). "Courts have also found that a restriction on engaging in repetitive motions does not amount to a substantial limitation of a major life activity." *Thomas v. N. Telecom, Inc.,* 157 F.Supp.2d 627, 632 (M.D.N.C.2000) (collecting cases). Therefore, the court finds that Plaintiff has failed to show that her alleged inability to lift heavy objects or do any repetitive motion including bending and pulling substantially limits her in any major life activity under the ADA.

Plaintiff also contends that "her condition also prevents her from acquiring employment other than a primarily sedentary desk-job." (Pl.'s Mem. Opp'n Defs.' Mem. and Mot. Summ. J. at 10.) The Supreme Court has not conclusively determined whether working is a major life activity; however, both the Supreme Court and the Fourth Circuit have decided cases under the assumption that working does qualify as a major life activity. *See Williams,* 534 U.S. at 200, 122 S.Ct. 681; *Channel Master,* 101 F.3d at 349. Assuming that working does qualify as a major life activity under the ADA, Plaintiff has failed to present sufficient evidence to create a genuine issue of material fact as to whether she is substantially limited in her ability to work.

In most cases involving a determination of whether an impairment substantially limits a major life activity, the EEOC regulations instruct that courts should consider several factors: " '[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment.' " *Williams,* 534 U.S. at 196, 122 S.Ct. 681 (quoting 29 C.F.R. §§ 1630.2(j)(2)(i)-(iii)). When a plaintiff alleges that she is substantially limited in the major life activity of working, the term "substantially limited" means " 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.' " *Sutton,* 527 U.S. at 491, 119 S.Ct. 2139 (quoting 29 C.F.R. 1630.2(j)(3)(i)). The EEOC regulations identify several additional factors that courts should consider when evaluating whether an individual is substantially limited in the major life activity of working, "including the geographical area to which the individual has reasonable access, and 'the number and types of jobs utilizing similar training, knowledge, skills or abilities, within the geographical area, from which the individual is also disqualified.' " *Id.* at 492, 119 S.Ct. 2139 (quoting 29 C.F.R. §§ 1630.2(j)(3)(ii)(A), (B)).

In the instant case, Plaintiff contends that her physicians have repeatedly stated that she can only work in a sedentary job that does not involve certain physical activities such as repetitive bending and heavy lifting. (Pl.'s Mem. Opp'n Def.'s Mem. and Mot. Summ. J., at 10.) However, a person is not disabled because she is unable to perform a particular job or narrow range of jobs. *Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 199 (4th Cir.1997) (citing *Heilweil v. Mount Sinai Hosp.,* 32 F.3d

718, 723 (2d Cir.1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995)). "To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton,* 527 U.S. at 492, 119 S.Ct. 2139.

The court recognizes that at some point the question of whether additional restrictions combine with a lifting restriction to form a disability becomes a question of fact. However, Plaintiff has not presented any evidence to show how her back condition affects her eligibility for other jobs. Plaintiff is a college graduate. Furthermore, Plaintiff has failed to define the geographical area to which she has reasonable access and within which she would expect to find employment. Plaintiff has also failed to produce sufficient evidence as to the number of non-sedentary jobs and types of sedentary jobs from which she is disqualified due to her back condition. Therefore, Plaintiff has failed to create a genuine issue of material fact concerning whether she qualifies as disabled under the ADA. The court will grant ARC's motion for summary judgment as to Plaintiff's ADA claims.

## CONCLUSION

For the foregoing reasons, ARC's motion for summary judgment will be granted.

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

### ORDER and JUDGMENT

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendants' motion for summary judgment [Doc. # 20] is **GRANTED**, and this action be, and the same hereby is, **DISMISSED** with prejudice.